761 A.2d 978

**In re CHARLES K.**

**No. 2354, Sept. Term, 1999.**

Court of Special Appeals of Maryland.

Nov. 6, 2000.

Geraldine K. Sweeney, Asst. Public Defender (Stephen E. Harris, Public Defender on the brief), Baltimore, for appellant.

Mary Ann Ince, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and Douglas Gansler, State's Atty. for Montgomery County, Rockville, on the brief), for appellee.

Submitted before HOLLANDER, KENNEY and ROBERT L. KARWACKI (Retired, Specially Assigned), JJ.

HOLLANDER, Judge.

What a difference a day makes; that adage aptly describes the posture of this case. In the relatively short time between a delinquent act committed by Charles K., appellant, and the juvenile disposition hearing, appellant received all the rehabilitative services he needed. Had the disposition hearing been held sooner, we would have a different case than the one now before us. Instead, we must consider whether the District Court for Montgomery County, Juvenile Division, erred at the disposition hearing by finding Charles K. a delinquent child

and in failing to dismiss the delinquency petition because, by the time of disposition, appellant was no longer in need of services or treatment.

On appeal, Charles presents one question for our consideration, which we have rephrased slightly:

Did the juvenile court err in refusing to dismiss the Delinquency Petition alleging that appellant was a delinquent child when, by the time of adjudication and disposition, appellant no longer fit the statutory definition of "delinquent child"?

For the reasons discussed below, we conclude that the court erred in finding appellant a delinquent child and in failing to dismiss the delinquency petition.

## FACTUAL SUMMARY

On May 19, 1999, Charles K. and two of his friends were playing in the woods with BB guns. All three became involved in shooting the BB guns at several younger children who were riding their bicycles in the area. Appellant was then 13 years old, and the victims were 10 years of age. Although two of the victims were struck by the BBs, nobody was hurt because "the respondents were far away" at the time of the occurrence. Charles and his friends were apprehended the same day and admitted their involvement. Thereafter, all three juveniles were charged with delinquency based on the offenses of assault and conspiracy. We focus here on what happened to Charles.

Charles's case was "informally adjusted" by the Department of Juvenile Justice (the "Department"), after the victims and their families indicated that "they wanted consequences but not necessarily court services," and agreed to informal adjustment. As part of the informal adjustment, Charles was required to attend both the Juvenile Education Training Seminar and the Victim Awareness Education Program, and to write an apology letter. Because Charles successfully complied with all conditions, and no further services were indicated, the Department recommended closure of the case.

Notwithstanding the Department's recommendation, the State filed a delinquency petition on August 16, 1999, alleging that Charles K. was a delinquent child. An adjudicatory hearing was held on October 6, 1999. Pursuant to negotiations with the State, Charles entered a plea of "involved" to conspiracy to commit second degree assault of three victims. The prosecutor presented the following statement of facts:

Had the State gone forward with an adjudication, you would have heard testimony that on May 19th, 1999, officers were dispatched to 3812 Palmera (Phonetic) Lane for a report on victims who had been shot with a—with a pellet gun. Those victims were Joseph Perry, John Perry, Travis Patrick, and Chantall Gouws, G–O–U–W–S. They advised the officers that while they were outside riding their bicycles, three suspects came up to them and displayed BB guns, and shot the victims without provocation.

The officer was speaking with [the] victims who identified their attackers as Theo, Charles and Joey. The officer was told by Joseph Perry that he knew where Theo lived. After going to Theo's apartment and getting no response, the officer was driving Perry back home, when he spotted Theo on Wendy Lane. The officer spoke with Theo, who advised that he was with Charles and Joey and that they had the BB guns.

The officer then spoke with Charles, who advised, with his mother present, his involvement in the incident. Charles [K.] advised that Joey had the guns at his house.

The officer then responded to Joseph [H.]'s apartment, and Joseph [H.] gave the officer both BB guns and two cartons of BBS. The guns were logged in at the station. All those events having occurred in Montgomery County, Maryland. That would be the State's case.

As a result of the plea, the State dismissed the remaining charges against Charles, including first degree assault and reckless endangerment. The disposition hearing followed immediately.

With respect to disposition, Ms. Josephson,[1] a representative of the Department, advised the court of the programs Charles had already completed in connection with the informal adjustment. She also said that no further services were indicated and therefore she recommended closure of the case, stating:

> This was actually the first contact for Charles [K.]. He currently lives with his mother. There are no reported behavoiral [sic] problems at home. He is abiding by a curfew of 8:00 every evening. He also—he's been attending Parkland Middle School. He's currently in the eighth grade. He has above-average grades, behavior—no reported troubles at school. His attendance has been excellent.
>
> He is in a special education program at school, intensity level 4. And he's about to transition to regular classes for his main subjects. He is currently—he was diagnosed with attention deficit and is taking Ritalin, and he's also on asthma medication. He has been attending group therapy at school since 1998. There is no suspicion or evidence of drug and alcohol use.
>
> This was a case that was originally informally adjusted by Juvenile Justice. Charles was asked at that time to attend the Juvenile Education Training Seminar. He was to attend the Victim Awareness Education Program, and write an apology letter. And he has successfully completed all of those conditions. So based on the fact that this is his only contact, he has no reported behavioral problems, and has complied with the conditions of his informal adjustment, we are recommending that this case be closed. No services are indicated at the time.

Thereafter, relying on the statutory definition of a delinquent child, appellant's attorney asked the court to "make a finding of not a delinquent child and dismiss the petition. . . ." Appellant's counsel further said:

---

1. Ms. Josephson was not under oath, and her first name is not mentioned in the transcript.

I'm in agreement with the—the Department's recommendation. Frankly, I think this is a case that—that fits the statutory definition of not a delinquent child. Other than the facts of the offense, there's nothing before the Court that tells us that Charles is in need of guidance, treatment or rehabilitation. It's indicated that the case is here at the State's Attorney's election, not due to informal adjustment recommended and flubbed; not due to victims are incensed and seeking justice. Not due to restitution unpaid, intransigence, anything like that.

\* \* \*

I mean, he's very bright, he does well in school. But it's just sort of—they're out there playing and it's just sort of recklessness and they just keep shooting one thing and moving on up to bigger and bigger targets until they're shooting at these other kids. Which is entirely wrong, he understands that, and I think he's taken responsibility.

I just don't see that in this case there's any evidence to the contrary, other than simply the acts in the case, particularly where there's no evidence that my client discharged the weapon—that he needs further guidance on this issue.

In response, the State said:

Your Honor, I ask that you not make a finding of no delinquency. But I would agree that it's actually kind of refreshing that they probably don't need at this point any further services. I—it sounds like they are all on the ball, and it sounds like their parents are—are on the ball, too, and really come down hard on them. And I think that with that in place, there's not much more the Department could do.

The juvenile court refused to dismiss the petition, reasoning that appellant met the definition of "delinquent child" on the date of the offense, even if he did not need services on the date of disposition. Instead, the court opted to close the case, given that no services were then needed. The court explained:

The definitions of delinquent act and delinquent child are set out, as [appellant's counsel] indicated, 3–801(k) and (*l*). Delinquent act means an act—an act which would be a crime if committed by an adult. Obviously, that—there has been such here.

*Delinquent child is a child who has committed a delinquent act and requires guidance, treatment or rehabilitation.* And I take that to not necessarily to be—to mean as of the date of the adjudication, but rather *as of the date of the—of the offense.* And I think that these—that these young men did—did require guidance and some degree of rehabilitation at that time. So I'm not going to dismiss the petitions. How—because *I do find that—that they were, by virtue of these acts, delinquent children.*

However, I am going to go along with the recommendation that no—since no further services are necessary at this point, that the—that the cases can be closed. . . . You all did a really good job of doing what you had to do after this was—after this was done.

\* \* \*

. . . I realize people make mistakes when they're young, but this could have been a real whopper. So benefit from—from what you learned in this, and I'm hoping I don't ever have to see any of you back here again. Okay?

All right, then the cases will be closed, then, without further services.

The docket entries reflect the following for October 6, 1999, in pertinent part: "Respondent plea entered. Judge Barry Hamilton heard the Adjudication. Court *found the Respondent to be a delinquent child* per Count # 9 as amended in the Petition and declared a ward of the Court. . . . Court further ordered the case closed." (Emphasis added). In addition, the court entered an "Order For Adjudication," finding "that the respondent *is* a delinquent child," and "is made and declared to be a ward of this Court." (Emphasis added). The court order also states "case closed."

## DISCUSSION

On appeal, appellant contends that the juvenile court erred by finding him delinquent and by failing to dismiss the delinquency petition. Appellant claims that, because the juvenile court found that he was not in need of services at the time of disposition, he was not a delinquent child under the Juvenile Causes Act (the "Act"), Maryland Code (1974, 1998 Repl.Vol., 1999 Supp.), §§ 3–801 to 3–837.1 of the Courts & Judicial Proceedings Article ("C.J."). Therefore, in appellant's view, the juvenile court was required to dismiss the delinquency petition. Moreover, appellant contends that the court was not entitled, as an alternative, simply to close the case without a disposition. In support of his position, appellant relies on *In re George V.*, 87 Md.App. 188, 589 A.2d 521 (1991), as well as C.J. § 3–801(*l*). He argues:

> The strained interpretation of the ruling of the Juvenile Court Judge in this case—that the dispositional needs of the child are to be judged not at the time of the disposition, but rather at the time of the commission of the delinquent act— does not comport with the plain language of the statute, the prior decisions of this Court, or common sense.

The State counters that, based on the court's determination at the disposition hearing that no further services were required, the court properly exercised its discretion to close the case without disposition. Further, the State argues that the juvenile court did not abuse its discretion in closing the case, because dismissal would have terminated the court's jurisdiction and diminished appellant's plea.

The question, then, is whether the Act or the Maryland Rules pertaining to Juvenile Causes, Rules 11–101 to 11–121, permitted the trial court to find Charles a delinquent child on the basis of his earlier commission of a delinquent act if, at the time of disposition, he did not require any services or treatment. If the court erred in finding that Charles was a delinquent child even though he was not in need of services, then we must determine if the court was required to dismiss the petition or, instead, was entitled merely to close the case.

A juvenile court has exclusive original jurisdiction over a child who is alleged to be delinquent. *See* C.J. § 3–804(a). The jurisdiction of the juvenile court is invoked by a petition alleging delinquency. C.J. § 3–812. If the juvenile court obtains jurisdiction over a child, jurisdiction continues until the child reaches 21 years of age, unless terminated sooner. C.J. § 3–806(a). Moreover, the Act must be liberally construed to effectuate its many purposes. C.J. § 3–802(b). The enumerated purposes include, *inter alia*, public safety; accountability and character development; holding parents responsible; providing for the care, development, and rehabilitation of children; and reinforcing family ties. C.J. § 3–802(a).

C.J. § 3–801(*l*) defines a delinquent as "a child who *has committed* a delinquent act *and requires* guidance, treatment, or rehabilitation." (Emphasis added). A "delinquent act" is one that would be a crime if committed by an adult. C.J. § 3–801(k).

In *George V.*, we considered whether a juvenile had a right to appeal from a juvenile court order in which the juvenile was found to have committed a delinquent act but was not found delinquent because he did not need services. Analogizing to criminal cases in which a defendant is found guilty but not criminally responsible by reason of insanity, we concluded that "the finding that appellant did commit a delinquent act cannot be precluded from appellate review by the favorable finding that he is no longer in need of services, and thus is not a delinquent child." *Id.* at 193, 589 A.2d 521. Significantly, we did not fault the juvenile court for entering a finding that the juvenile was not delinquent because he did not require services. Although *George V.* presented a different issue than the one before us, what we explained as to the process is useful to our analysis:

> Md. Cts. & Jud. Proc.Code § 3–801(*l*) defines "delinquent child" as " . . . a child who has committed a delinquent act *and* requires guidance, treatment, or rehabilitation." (Emphasis added.) The process by which a child is determined to be delinquent consists of a two-step procedure: an adjudicatory hearing, then a disposition hearing. Only after the

adjudicatory judge finds that the child has committed a delinquent act *and* the dispositional judge finds that the juvenile **is** in need of guidance, treatment or rehabilitation, can a juvenile be classified as a "delinquent child."

87 Md.App. at 190–91, 589 A.2d 521 (boldface added).

Thus, when a juvenile court finds after an adjudicatory hearing that a juvenile has committed a delinquent act, the child is not necessarily delinquent. The Act establishes by its terms two co-equal conditions that combine to establish delinquency under the statute: a delinquent act and a current need for services.

Ordinarily, the juvenile court must hold a disposition hearing following a finding of a delinquent act, in order to determine whether the child "needs or requires the court's assistance, guidance, treatment or rehabilitation." C.J. § 3–801(n)(1). If so, the court must then determine the nature of the particular services that are needed. *Id.; see* Md. Rule 11–115.

C.J. § 3–820 delineates the range of possible dispositions following a finding that the juvenile committed a delinquent act. C.J. § 3–820(d) provides:

(d) *Permitted dispositions on petition.*—(1)  In making a disposition on a petition, the court may:

(i) Place the child on probation or under supervision in his own home or in the custody or under the guardianship of a relative or other fit person, upon terms the court deems appropriate;

(ii) Subject to the provisions of paragraph (2) of this subsection, commit the child to the custody or under the guardianship of the Department of Juvenile Justice, a local department of social services, the Department of Health and Mental Hygiene, or a public or licensed private agency on terms that the court considers appropriate to meet the priorities set forth in § 3–802 of this subtitle, including designation of the type of facility where the child is to be accommodated, until custody or guardianship is terminated

with approval of the court or as required under § 3–825 of this subtitle; or

(iii) Order the child, parents, guardian, or custodian of the child to participate in rehabilitative services that are in the best interest of the child and the family.

Rule 11–115(b) is also pertinent. It provides, in part, that "disposition . . . shall be in accordance with Section 3–820(b) of the Courts Article."

The State agrees that Charles did not need services, but does not address whether the court erred in finding that Charles was a delinquent child. Rather, it argues that, at the disposition, the court had the discretion to close the case, rather than to dismiss it, even if it found that no treatment, guidance, or rehabilitative services were necessary. As we noted, the State complains that dismissal would have precluded the court from exercising revisory power in the matter and would have vitiated appellant's admission to the delinquent act. It relies on Md. Rules 11–116 and 11–120 to support its view. These rules provide:

**Rule 11–116.   Modification or vacation of order.**

a. *Revisory power.* An order of the court may be modified or vacated if the court finds that action to be in the best interest of the child or the public, *except* in cases involving commitment of a child to the Department of Health and Mental Hygiene for placement in a State mental hospital. In cases involving such commitment the court shall proceed as provided in Rule 11–115.

b. *Sua sponte or on petition.* The court may proceed under section a of this Rule on its own motion, or on the petition of any party or other person, institution or agency having supervision or custody of the respondent, setting forth in concise terms the grounds upon which the relief is requested. If the court proceeds on its own motion, the order shall set forth the grounds on which it is based.

c. *Hearing—When required.* If the relief sought under section a of this Rule is for revocation of probation and for the commitment of a respondent, the court shall pass an

order to show cause why the relief should not be granted and setting a date and time for a hearing. The clerk shall cause a copy of the petition and Show Cause Order to be served upon the parties. In all other cases, the court may grant or deny the relief, in whole or in part, without a hearing.

d. *Conduct of hearing.* In the interest of justice, at any hearing held pursuant to this Rule the court may decline to require strict application of the rule in Title 5, except those relating to the competency of witnesses.

**Rule 11–120.   Final order of termination.**

A final order of termination of the proceedings may, in the court's discretion, be entered on the court's own motion at any time after the court's jurisdiction over the respondent is terminated, or upon the recommendation of the appropriate governmental or social agency exercising supervision over the respondent.

We apply the same principles of construction for both statutes and rules of procedures. *State v. Wiegmann,* 350 Md. 585, 592–93, 714 A.2d 841 (1998); *Long v. State,* 343 Md. 662, 667, 684 A.2d 445 (1996); *In re Victor B.,* 336 Md. 85, 94, 646 A.2d 1012 (1994). We turn to review those principles.

" 'The cardinal rule of statutory interpretation is to ascertain and effectuate the intention of the legislature.' " *Degren v. State,* 352 Md. 400, 417, 722 A.2d 887 (1999)(quoting *Oaks v. Connors,* 339 Md. 24, 35, 660 A.2d 423 (1995)); *see Roberts v. Total Health Care, Inc.,* 349 Md. 499, 523, 709 A.2d 142 (1998); *McGraw v. Loyola Ford, Inc.,* 124 Md.App. 560, 592, 723 A.2d 502, *cert. denied,* 353 Md. 473, 727 A.2d 382 (1999). To determine legislative intent, we look primarily to the statute itself. *Catonsville Nursing Home, Inc. v. Loveman,* 349 Md. 560, 570, 709 A.2d 749 (1998). In doing so, we consider "the language of an enactment" and give "that language its natural and ordinary meaning." *Montgomery County v. Buckman,* 333 Md. 516, 523, 636 A.2d 448 (1994); *see Lewis v. State,* 348 Md. 648, 653, 705 A.2d 1128 (1998); *Carroll County Ethics Comm'n v. Lennon,* 119 Md.App. 49, 67, 703 A.2d 1338 (1998).

As the Court recently said in *Martin v. Beverage Capital Corp.*, 353 Md. 388, 399, 726 A.2d 728 (1999), "[i]n determining legislative intent, we must never lose sight of the overriding purpose and goal of the statute." This is because "the search for legislative intent is most accurately characterized 'as an effort to "seek to discern some general purpose, aim, or policy reflected in the statute." ' " *Id.* (quoting *Kaczorowski v. Mayor and City Council*, 309 Md. 505, 513, 525 A.2d 628 (1987), in turn quoting Melvin J. Sykes, *A Modest Proposal for a Change in Maryland's Statutes Quo*, 43 MD.L.REV. 647, 653 (1984)). Moreover, when analyzing a statute, "we seek to avoid constructions that are illogical, unreasonable, or inconsistent with common sense." *Frost v. State*, 336 Md. 125, 137, 647 A.2d 106 (1994). In addition, the statute must be considered as a whole; "all sections of the Act must be read together, in conjunction with one another, to discern the true intent of the legislature." *Philip Elects. v. Wright*, 348 Md. 209, 216, 703 A.2d 150 (1997).

Similarly, with respect to the Maryland Rules, we seek to ascertain the Court of Appeals's intent in promulgating the rule. *Morales v. Morales*, 111 Md.App. 628, 632, 683 A.2d 1124 (1996), *cert. denied*, 344 Md. 567, 688 A.2d 446 (1997); *Stach v. Stach*, 83 Md.App. 36, 40, 42–3, 573 A.2d 409 (1990). As with statutes, we construe the words in the text of a rule in accordance with their plain meaning, *Long*, 343 Md. at 667, 684 A.2d 445; *In re Victor B.*, 336 Md. at 94, 646 A.2d 1012, giving effect to the rule as a whole. *Long*, 343 Md. at 667, 684 A.2d 445; *In re Victor B.*, 336 Md. at 94, 646 A.2d 1012. When a rule is ambiguous, we may look to other sources in order to determine the intent of the Court of Appeals. *Long*, 343 Md. at 667, 684 A.2d 445; *In re Victor B.*, 336 Md. at 94, 646 A.2d 1012; *Leppo v. State Highway Admin.*, 330 Md. 416, 422, 624 A.2d 539 (1993). Even when the language is clear, however, we may consider extrinsic material that " 'fairly bears on the fundamental issue' " of the purpose or goal of the rule. *Stach*, 83 Md.App. at 42, 573 A.2d 409 (quoting *Kaczorowski*, 309 Md. at 515, 525 A.2d 628). But, we are not to embellish a provision so as to enlarge its

meaning. Rather, "[o]ur mission is to give the rule a reasonable interpretation in tune with logic and common sense." *In re Victor B.*, 336 Md. at 94, 646 A.2d 1012.

■ In our view, the statutory language defining "delinquent child" is clear and unambiguous. Indeed, the plain words of the statute contradict the State's interpretation. There is no ambiguity about the meaning of "a child who has committed a delinquent act." As the court below noted, that phrase speaks to the past. In contrast, the other requirement for delinquency is embodied in the phrase "requires guidance, treatment, or rehabilitation." What we find most significant is the change of tenses within the statutory definition. Although the commission of a delinquent act is stated in the past tense, the requirement for guidance, treatment, or rehabilitation is clearly expressed in the present tense. Therefore, to satisfy the statutory definition of a delinquent child, the court had to find that Charles had committed a delinquent act *and* that he currently *is* in need of guidance, treatment, or rehabilitation. Here, the juvenile court found that appellant met the first of these two conditions, but not the second. Therefore, appellant did not meet the statutory definition of a "delinquent child."

■ Moreover, C.J. § 3–820(d) is not ambiguous. It specifically enumerates the permitted dispositions with regard to a petition, and closing the case without ordering services is not one of them. Nor do the two Maryland rules on which the State relies confer upon a juvenile judge the authority that the State suggests. The construction of the Act and rules as urged by the State would engraft upon them a meaning not evident from the plain text.

In reaching these conclusions, we are mindful of the broad social purposes that undergird the Juvenile Causes Act and the special role of the juvenile court in seeking to protect and rehabilitate children. *In re Victor B.*, 336 Md. at 91, 646 A.2d 1012. Indeed, the courts of Maryland have steadfastly construed the Act "to reflect the principle that juvenile proceedings are special in nature and are not criminal proceedings." *Id.* at 93, 646 A.2d 1012. Consistent with the salutary pur-

poses of the Act, we do not believe a judge is authorized to retain jurisdiction after expressly finding at the disposition that a juvenile is not in need of services or treatment. Accordingly, we conclude that the court erred in finding that appellant is a delinquent child and in failing to dismiss the delinquency petition.

**JUDGMENT REVERSED. COSTS TO BE PAID BY MONTGOMERY COUNTY.**