7 A.3d 106

**In re ALIJAH Q.**

**No. 2634, Sept. Term, 2009.**

Court of Special Appeals of Maryland.

Oct. 27, 2010.

Nenutzka C. Villamar (Paul B. DeWolfe, Public Defender, on the brief), Baltimore, MD, for Appellant.

Hilma J. Munson (Douglas F. Gansler, Atty. Gen., on the brief), Baltimore, MD, for Appellee.

Panel: HOLLANDER, WRIGHT and IRMA S. RAKER (Retired, specially assigned), JJ.

HOLLANDER, J.

In December 2008, the Prince George's County Department of Social Services (the "Department" or "DSS"), appellee, alleged that Alijah Q., appellee, the son of Lisa Q., appellant, and Antoine A.,[1] was a Child in Need of Assistance ("CINA"). Following a hearing in February 2009, Alijah was declared a CINA, and placed in the care and custody of his father. After a review hearing in May 2009, the juvenile master recommended that Alijah remain in Mr. A.'s care, with supervised visitation granted to appellant, and that the court terminate its jurisdiction. Unhappy with that recommendation, appellant noted her exceptions. The Circuit Court for Prince George's County held a de novo exceptions hearing on October 23, 2009, and overruled Ms. Q.'s exceptions on December 23, 2009.

This appeal followed. Appellant presents two questions, which we quote:

---

1. Mr. A. participated in the CINA proceedings but has not participated in this appeal.

I.  Did the court err in discharging the mother's counsel [at the exceptions hearing] without first obtaining a valid waiver of her right to counsel?

II.  Did the court err in denying the mother custody and unsupervised visitation?

For the reasons set forth below, we shall vacate and remand for further proceedings.

## FACTUAL AND PROCEDURAL BACKGROUND

Alijah was born on December 14, 2007.  On December 17, 2008, DSS filed a CINA petition alleging, *inter alia,* that Ms. Q. had a history of drug use;  that Alijah was born exposed to drugs;  that Ms. Q. had been absent from the family home;  and that both parents had exposed Alijah to domestic violence.

At a preliminary proceeding on January 14, 2009, both parents were advised of their rights, including the right to counsel.  Both requested legal representation by the Office of the Public Defender.  In preparation for a CINA hearing on February 10, 2009, DSS submitted a report dated February 3, 2009.  It alleged, *inter alia,* that Ms. Q. had not yet entered an inpatient treatment program;[2] that Ms. Q. admitted to smoking crack cocaine on Christmas Day;  that domestic violence between Ms. Q. and Mr. A. continued to be a problem;  that Ms. Q. "reported that if Mr. [A.] obtains care and custody of Alijah, then she would leave Alijah";  and that she "threatened the Agency ... stating that if the Agency does not intervene with the ongoing domestic violence within the home, then she would drop Alijah off at the Department."  Further, the report stated:

---

**2.** The report also provided information relating to Ms. Q.'s previous treatment programs.  It said:

> A service plan was implemented, which stated that Ms. [Q.] will enter and complete a 28 day program at Mountain Manor.  It also indicated that Ms. [Q.] would enter a long term inpatient program after completing the program at Mountain Manor.  She entered Second Genesis on November 17, 2008 and left on November 27, 2008.

Ms. Q. reported to the Agency that she felt as though the petition was being prejudice [sic] against her. She stated "Mr. [A.] treats me in a demeaning way. He is a master of manipulation." Ms. [Q.] remains vague in her description of Mr. [A.]'s behavior. She acknowledges that he is a good father and provides for his child.

At the hearing on February 10, 2009, Ms. Q. was represented by the Office of the Public Defender; Mr. A. proceeded without legal counsel. Evidence and proffers were presented to the master.

Thereafter, the circuit court issued an "Adjudication And Disposition Hearing Order," dated March 5, 2009. It found that the allegations in the CINA petition, as amended, had been proven by a preponderance of the evidence, and that Alijah was a CINA. Further, the court ordered that Alijah remain in the custody of Mr. A., under the protective supervision of DSS. However, it also stated that the child could be placed with Ms. Q. in an inpatient substance abuse program, or, if she were not to pursue such a program, then she "shall" be granted "liberal" visitation. In addition, the court ordered DSS to provide referrals for various services,[3] and ordered the parties to enter into a service agreement.

On March 31, 2009, Ms. Q. filed a "Motion for Immediate Hearing on Visitation," which she amended on April 7, 2009. At an emergency review hearing before the master on April 20, 2009, DSS presented a report discussing visitation. It said, in part:

Ms. [Q.] expressed concerns of not being able to see her son on a regular basis. Ms. [Q.] reported that when she visited her son, he began to cry hysterically, bite and scratch himself. She also reported that when she picked him up, he

---

3. The services included a "[d]evelopmental assessment" for Alijah; "[i]n patient substance abuse treatment" for Ms. Q.; "[m]edication management" for Ms. Q.; and a "[d]omestic violence lethality assessment for both parents." The court also ordered Mr. A. to submit to a paternity test. The results of that test indicated a 99.94% probability of paternity. The court subsequently found Mr. A. to be Alijah's father.

turned away from her. . . . Worker offered to pick Alijah up and bring him to the office, as deemed necessary for the well-being of the child. Worker does not have a telephone number or address of Ms. [Q.]; therefore, the arrangement/visitation has been difficult to plan.

It has been reported that Ms. [Q.] visits the home of Mr. [A.] to visit her son. The visits do not appear to be conducive to the welfare of the child. During one visit, it was reported that Ms. [Q.] became hostile toward Mr. [A.] in the presence of her son Alijah. Ms. [Q.] reported that she only kicked the door. Worker was on the phone and overheard Ms. [Q.] in the background kicking and screaming. Mr. [A.] acknowledged that he went to his neighbor's home and later went to sit in his car until Ms. [Q.] calmed down.

In an "Emergency Review Hearing Order" dated May 8, 2009, the circuit court ordered liberal, supervised visitation for Ms. Q. In addition, the court again ordered a "[d]evelopmental assessment" for Alijah and various services for Ms. Q.

At a permanency plan review hearing before the master on May 11, 2009, appellant did not appear. However, her attorney was present. Mr. A. submitted documentation of his completion of a domestic violence intervention program. DSS submitted a report dated April 24, 2009, stating, in part: "It was agreed that Ms. [Q.] would enter into Crownsville on several occasions. To date, she has refused to enter into treatment." In addition, the report noted that Ms. Q. had not participated in any of the supervised visits with Alijah scheduled by DSS. Moreover, the Department documented that Alijah was doing well in his father's care, and recommended that Mr. A. be granted sole custody of Alijah, with liberal and supervised visitation awarded to Ms. Q. Because DSS was of the view that there no longer existed child welfare issues requiring the continued involvement of DSS or the juvenile court, it asked the court to close the case.

In a "Review Hearing Order" dated May 12, 2009, the master found:

Respondent ... has remained in the custody of his father, [Mr. A.], during this review period. The Department has retained protective supervision. Alijah continues to receive the appropriate care in his father's custody. Mr. [A.] provided documentation of completion of the domestic violence classes. ... The court noted Ms. [Q.'s] counsel's comments regarding some of the information in the court report about Ms. [Q.'s] other children not being backed up by any evidence. Ms. [Q.] has not entered into Crownsville as she indicated she would at the emergency hearing ... nor has she entered any treatment program. Ms. [Q.] has not been available for any of the supervised visits at the Department and she did not appear for today's hearing.

Further, the master recommended that Alijah remain in the custody of Mr. A., with liberal, supervised visitation granted to Ms. Q. The master also recommended rescission of DSS's protective supervision and termination of the court's jurisdiction, stating that "the father is providing the proper care and attention needed to care for the child and that continuing jurisdiction is contrary to the Respondent's best interests."

On May 21, 2009, Ms. Q. noted exceptions, complaining that the master's findings, conclusions, and recommendations were contrary to the evidence. In particular, Ms. Q. asserted that the "Father is not a fit and proper person to have custody of the minor child"; that "she is the proper person to have custody of the minor child"; and that "supervised visitation ... is not in the best interests of the child." She also requested a de novo hearing.

In preparation for the exceptions hearing scheduled for August 21, 2009,[4] DSS submitted a report to the court filed August 10, 2009.[5] It said:

---

4. An exceptions hearing was previously scheduled for June 26, 2009, but was postponed by agreement.

5. The report contains the date of April 24, 2009. However, we believe it is an updated version of the report of the same date, submitted at the hearing on May 11, 2009.

On July 31, 2009, Ms. [Q.] visited her son at the Agency as arranged. Ms. [Q.] fed her son his lunch for breakfast instead of giving him the oatmeal that was placed in his bag. Ms. [Q.] brought a new pair of shoes for her son. She fitted the shoes on his feet without taking the stuffing in the toe area out. She also allowed her son to walk outside with one shoe on and the other shoe was off his foot.

To date, Ms. [Q.] has yet to enter into an inpatient drug treatment program. She refused to give worker any information pertaining to her treatment. . . .

Ms. [Q.] visited the Agency. . . . Ms. [Q.] verbally reported to the team that it was her goal to get Mr. [A.] locked up. She noted that if he goes to jail then she would be able to obtain care and custody for her son. . . . She noted that she will do whatever it takes to get her son back because she is not going to allow Mr. [A.] to keep Alijah.

The exceptions hearing was subsequently postponed until October 23, 2009. About two weeks earlier, on October 9, 2009, Vicki Wolfson, Esquire submitted a line striking her appearance as counsel for appellant and entering the appearance of Susan Gilhooly as counsel for Ms. Q.

Prior to the hearing, Ms. Gilhooly never filed a motion to withdraw her appearance, pursuant to Maryland Rule 2–132. Instead, at the outset of the hearing on October 23, 2009, she orally moved to be discharged, and the court granted that request.[6] The following colloquy is relevant:

[MS. GILHOOLY]: Good afternoon, Your Honor. Susan [Gilhooly], attorney from the Public Defender's Office. It was my intention, and I came here prepared to enter my appearance—just give me a second here—on behalf of Ms.

---

6. In Alijah's brief, his counsel asserts:

Just prior to the start of the hearing, Ms. Q. fired her public defender and indicated to Judge Nichols her intention to proceed *pro se*. The assistant public defender asked the court to discharge her, provided to Ms. Q. some documents, and was then excused.

Our review of the record does not reflect that Ms. Q. actually indicated her desire to proceed pro se.

[Q.], mother of the child. However, she's just most recently asked that I not represent her. Vicki [Wolfson] was the previous attorney, and that will be how the record stands.[7]

THE COURT: All right. So, you want to be excused, is that the case?

[MS. GILHOOLY]: Please.

THE COURT: All right. We'll excuse you, unless somebody objects.

The transcript does not reflect any objections.[8] Ms. Gilhooly subsequently advised the court that Ms. Q. was "asking for her file," and that Ms. Gilhooly "handed her . . . a copy of the [DSS] report" as well as "the exception" that was filed on appellant's behalf.[9]

At the hearing that ensued, DSS submitted a report dated October 2, 2009, which recited a litany of allegations that DSS had made in previous reports, as well as Ms. Q.'s refusal to provide DSS with her home address or information regarding her drug treatment. The report also claimed that Ms. Q. had verbally threatened a DSS worker during a supervised visit with Alijah. In addition. counsel for DSS maintained that Alijah was no longer a CINA, and asked the court to adopt the master's recommendation. DSS's attorney also recommended that Ms. Q. complete parenting classes and that visitation remain in "the current configuration," i.e., supervised.

Counsel for Alijah argued:

---

7. In the transcript, Ms. Gilhooly's name was incorrectly spelled "Gilbowy," and Ms. Wolfson's name was incorrectly spelled as "Wilson."

8. Following the court's comment, "unless somebody objects," Alijah's attorney immediately addressed the court, identifying herself as the child's attorney and "mention[ing] that Mr. Anderson, the child's father, is here."

9. We cannot determine from the transcript whether Ms. Gilhooly remained for the duration of the proceedings. However, when Ms. Q. was unable to locate "the report," Ms. Gilhooly said: "Ms. [Q.], you are aware that you cannot call me as a witness." Ms. Q. did not respond. We found no other references in the transcript to Ms. Gilhooly.

I believe that Alijah is receiving appropriate care with his father, and I agree with the Department that he is no longer a child in need of assistance. As [counsel for DSS] pointed out, Alijah has been in his father's custody since February of this year, and I think the Department's report reflects that there are no concerns concerning the care that Mr. [A.] is providing his son. I am in agreement that the—with the Department that this case be closed, that the Department's interests be terminated, and that the order stands as was submitted by the Master, the custody to the father with liberal and supervised visitation to the mother.

Ms. Q. stated that she "disagree[d] with the findings of the Court" and that she wished to "dispute some matters." Thereafter, Ms. Q. called Madeccia Lovett–Sampson,[10] the DSS case worker.

Ms. Q. sought to establish that she had made numerous calls to DSS about Alijah's care. She also attempted to show that one of the assessments ordered for Alijah had taken a great deal of time to arrange. The following colloquy is relevant:[11]

[MS. Q]: Do you recall how long you took to have that assessment for Alijah?

[COUNSEL FOR DSS]: Objection, Your Honor.

THE COURT: Why do you object?

[COUNSEL FOR DSS]: Not specific. There were several recommendations for various assessments.

[MS. Q.]: Okay. Well, I can move onto another one.

Ms. Q. inquired about domestic violence, visitation, and her treatment for substance abuse. The following exchange is noteworthy:

[MS. Q.]: ... Do you also recall me calling you numerous times, even to the point of saying that I would bring Alijah

---

10. In the transcript, Ms. Lovett–Sampson's name was erroneously spelled "Medisia Lovett Sampson."

11. We quote several colloquies because they reveal the difficulty Ms. Q. had in her examination of the witness, a circumstance relevant to the first issue, discussed *infra*.

to the agency if you did not intercede in the domestic violence that was going on in the house?

\* \* \*

[MS. LOVETT–SAMPSON]: I asked you to sign a service plan, and I asked you to—if you and Mr. [A.] were not getting along, for you to leave the house. I put in place an assessment for you to go into drug rehab, which you did go in, you was [sic] discharged out. Then, we also made preparations for you to go into a long-term drug treatment program, and you did not adhere to any of the agency's recommendations.

[MS. Q.]: Okay. And did that long-term program—do you recall me calling you from that treatment center saying that it was not an appropriate place for me or Alijah?

\* \* \*

[MS. LOVETT–SAMPSON]: The first agency that you attended, which was Second Genesis, from my understanding, you had several loud outbursts and you was [sic] not adhering to their recommendations, nor their program. Therefore, they discharged you. Upon their assessment, it was also indicated that it was not in the best interest of Alijah for him to go to Crownsville with you, and that was the second drug treatment that we requested that you go to.

[MS. Q.]: Uh-huh. Okay.

[MS. LOVETT–SAMPSON]: And you indicated that you were not going without your son. And it was in the—his best interests that he did not attend that program with you, because he had a nurturing environment in which to go to, which was with his father.

[MS. Q.]: Right, and I agree with that. He did have a nurturing—

[COUNSEL FOR DSS]: Objection.

[MS. Q.]: Okay.

THE COURT: It's okay. Objection sustained.

[MS. Q.]: Okay. And so, are you also aware of—that Crownsville was not a facility that was for children?

\* \* \*

[MS. LOVETT–SAMPSON]: The treatment was based for you, Ms. [Q.], not for Alijah.

Ms. Lovett–Sampson then testified that she had visited Mr. A.'s home and found that Alijah was living in a nurturing environment. Ms. Lovett–Sampson also said that she had supervised visits between Ms. Q. and Alijah. She described one visit that occurred after Ms. Q. had filed her Exceptions, when Ms. Lovett–Sampson observed Ms. Q. shake Alijah so hard that the case worker immediately ended the visit. Ms. Q. challenged the worker's failure to report Ms. Q. to the police for what Ms. Q. called "abuse" that "harm[ed]" her child and placed him in "impending danger." The social worker testified that she ended the visit and met with Ms. Q. to sign a safety agreement, rather than call the police or report the abuse to Mr. A., because it was Ms. Lovett–Sampson's mission as a Family Preservation worker to try to preserve the family.

In addition, Ms. Q. attempted to show that, while Alijah was in Mr. A.'s care, Alijah missed several medical appointments that Ms. Q. had made for him. Ms. Lovett–Sampson responded that Mr. A. was responsible for scheduling Alijah's medical appointments, and that Ms. Q. should not have been making them in the first place. Ms. Q. requested the DSS report from the Department's counsel, but her request was rebuffed by the court:

Hold on a second. He's not here to help you. \* \* \* He represents another entity in this case. You had a lawyer that apparently you discharged this afternoon. \* \* \* I appreciate this is difficult for a layperson to walk into a serious courtroom proceeding and have it all work out—

Ms. Q. also posed questions to Ms. Lovett–Sampson concerning the worker's duties. Specifically, Ms. Q. took issue with Ms. Lovett–Sampson's recommendation that Ms. Q. leave the home she shared with Mr. A. and seek inpatient treatment for substance abuse. The following exchange is relevant:

[MS. Q.]: Is that the training that you get from the—your superiors is to remove one person for domestic count— violence, to remove one person from the home?

[COUNSEL FOR DSS]: Objection.

THE COURT: Objection sustained. Next question, please.

[MS. Q.]: Ms. [Lovett–Sampson], are you aware that removing one person from the home does not end mental illness or emotional illness?

\* \* \*

[MS. LOVETT–SAMPSON]: That is why we recommended that you go into your in-patient [sic] drug treatment program that would adhere to your mental health issues, as well as your drug treatment.

[MS. Q.]: ... Did you ever advise Mr. [A.] to have any treatment at all?

[MS. LOVETT–SAMPSON]: His assessment came back clear.

[MS. Q.]: Okay, for domestic violence?

\* \* \*

[MS. LOVETT–SAMPSON]: He was already within a program. \* \* \* And he completed the program, and I received a certificate.

Further, Ms. Q. attempted to elicit testimony from Ms. Lovett–Sampson on the number of visits the worker had paid to "the home" and Ms. Q.'s requests that DSS look into Mr. A.'s "alcohol problem and ... anger problem." Ms. Q. drew an objection from counsel for DSS, which the court sustained, when she asked:

[D]o you recall how many times in what period of time between the time that I told you that that [sic] you had an assessment—actually the assessment actually was not—it was not you that wanted the assessment done. I don't know how, but do you recall after the numerous times I asked you to look into it until it was finally done?

The following colloquy ensued:

[MS. Q.]: I don't see what's wrong with that questioning. THE COURT: I understand that. * * * That's why I'm sitting up here and you're standing there, to be honest. * * * And if I go into a great deal of detail for you, then I'm going to be standing next to you being your lawyer and not being the Judge in this case, is the problem. * * * So, telling me you don't understand why, you ask me to explain it, then—well, we already had a lawyer for you, you discharged. So, don't be disappointed.

Ms. Q. also pursued the issue of an ex parte protective order that Ms. Lovett–Sampson had advised Mr. A. to file after an incident in which Ms. Q. allegedly went to Mr. A.'s house and kicked his door. She again attempted to show that Ms. Lovett–Sampson had not assisted Ms. Q. with respect to Ms. Q.'s complaints of domestic violence. The following exchange is pertinent:

[MS. Q.]: ... [D]id you ever recommend or try to aide [sic] me in my plight of domestic violence in the home?

[COUNSEL FOR SOCIAL SERVICES]: Objection.

THE COURT: Sustained. Next question. It's sustained for a number of different reasons, and one of those are it assumes facts not in evidence. Next question.

[MS. Q.]: Can you say that one more time—I didn't hear you, sir, please?

THE COURT: I said it was sustained, because it assumes facts not in evidence in your question. I won't comment further, because I probably shouldn't. * * * I just don't want to sit up here and say objection every time you ask a question—* * *—and you think I'm not giving you your day in court.

Subsequently, Ms. Q. attempted to establish that Ms. Lovett–Sampson was biased in favor of Mr. A. Ms. Lovett–Sampson asserted that she has "entertained [Mr. A.'s] wishes, as well as [Ms. Q.'s] wishes," and stated that her job was to assess "the safety of [Alijah] at the time that [she] received the case."

Thereafter, Ms. Q. sought to call two additional witnesses: her sister and a woman from a foundation that assists victims of domestic violence. At the court's suggestion, Ms. Q. made a proffer as to their testimony.[12] She said that both would assist in facilitating visitation between Ms. Q. and Alijah.

The court also allowed Ms. Q. to make a statement. Ms. Q., who was not under oath, told the court that she was "aware that [she] cannot take care of [Alijah]," but wanted Mr. A. to undergo "parental counseling" and to take proper care of the child. Ms. Q. also suggested that counsel for Alijah was biased in favor of Mr. A. Further, she said:

> My concern is this, is that because Mr. [A.] for whatever reason—he may have—he may be angry with me, because I did him wrong, but he's done the same. And we both need a lot of help, so even though the Court might not indulge me, what the child's attorney did say, that at least they were going to try to—she said this, and I have other witnesses of the attorney say that she was going to ask for parental counseling for him. And then, she turned around, and she reneged on it. All I wanted was family counseling for the family....

> But all I'm asking the Court is, is that we—that Alijah be properly taken care of, but I just think he is, but I think he needs a little help. And I just want enough time so that he doesn't have to internalize, saying, "Where is my Mommy?" because I remember the first time when I left him for 30 days how when he saw me—I walked up to the car, and he looked at me, and he just started screaming. He started crying, and then we got him in the house. He was kicking, he was biting, he would look at me....

> But the emotional empathy that [Mr. A.] has for my son is why I'm standing here. Its [sic] not—it's close to zero .... he puts himself first.... I've seen him put his own children

---

12. The court had previously stated that it would adjourn at 4:00 p.m. Based on Ms. Q.'s brief, we assume that the 4 o'clock hour was approaching.

at risk, calling them in the room, calling me a crackhead and saying I have nine children. . . .

*   *   *

—all I'm asking for now is, is that my child get enough time to bond with me and that we will—I will come back and try to get him later when I get more stabilized.

Mr. A. informed the court that he was "taking counseling and [attending] parenting classes right now." No other information was presented to the court.

Thereafter, the court orally overruled Ms. Q.'s exceptions.[13] Then, on December 23, 2009, the court issued a "Review Hearing Order," granting custody of Alijah to Mr. A.

Regarding Ms. Q.'s discharge of counsel, the Review Hearing Order stated:

> The Court notes that initially Susan Gilhooly, Assistant Public Defender also appeared as counsel for the Respondent's mother; however, Ms. Gilhooly advised the Court that the mother no longer wished to be represented by the Office of the Public Defender. *The Court verified with the mother that she no longer wanted the services of the Office of the Public Defender, and that she wanted to proceed without the assistance of counsel.* The Court excused Assistant Public Defender Susan Gilhooly and her appearance was struck. (Emphasis added.)

In addition, the court said:

> Respondent Alijah Q. has remained in the custody of his father Antoine A. during the review period. The Department retained protective supervision. The Respondent continues to receive the appropriate care in his father's custody. During the review period the mother retained supervised visitation with the Respondent. There were some incidents of concern during the mother's supervised visits

---

13. In a handwritten letter from Ms. Q. to Judge Missouri, filed on November 6, 2009, Ms. Q. complained about the hearing. She averred, *inter alia*, that she had "never [been] given a chance to present any evidence," including that no drugs were found in her system.

as detailed in County's Exhibit One and as testified to by the Department's worker that lead the Court to conclude that continued supervised visitation is warranted.

The court also rescinded the award of protective supervision to DSS, ordered "liberal and supervised" visitation to Ms. Q., "terminated" the "interest" of DSS and the court, and closed the case.

## DISCUSSION

Appellant contends that the court erred in discharging Ms. Q.'s counsel without first obtaining a valid waiver of counsel. Noting that she had a statutory right to counsel, pursuant to Maryland Code (2006 Repl.Vol., 2009 Supp.), § 3–813(a) of the Courts & Judicial Proceedings Article ("C.J."), Ms. Q. argues that the court was required to follow the waiver of counsel procedure delineated in Rule 11–106(b)(1). In her view, that rule applies to juvenile delinquents as well as to the parties in CINA cases. Noting that the court's Review Hearing Order stated that it had "verified with the mother that she no longer wanted" counsel, Ms. Q. contends that the court's finding is not supported by the record.

In addition, Ms. Q. insists that she was prejudiced by the lack of counsel. She points to the court's failure to analyze "whether there was a likelihood of further abuse or neglect by Ms. Q. if she were granted custody or unsupervised visitation." In her view, "the court erred in granting only supervised visitation," as the "incidents" concerning Ms. Q. "do not rise to the level at which supervised visitation is necessary." Further, Ms. Q. complains that the court "erred in failing to order a specific visitation schedule."

In support of her position, appellant maintains that counsel would have protected her due process rights. She asserts that "there was no way for the court to assess the credibility or reliability of the evidence," and suggests that the "assistance of counsel would have been critical in addressing these evidentiary issues." Further, Ms. Q. contends that her opportunity to present her case was "severely curtailed." She cites

her unsuccessful examination of Ms. Lovett–Sampson; the numerous objections that the court sustained; the court's decision to require her to proffer witness testimony; and its insistence on concluding proceedings by 4:00 p.m.

Appellees contend that the court did not violate Rule 11–106(b). Alijah recognizes that "a parent in a CINA proceeding is entitled to the assistance of counsel and that this right must be explained pursuant to the waiver procedure of Md. Rule 11–106(b)(1)." But, he contends that "it is not clear that the waiver procedure [in Rule 11–106(b)] applies in the circumstances of this case." Rather, Alijah suggests that a "lesser degree of compliance with Md. Rule 11–106(b)" is all that is required in CINA cases. In the Department's view, however, Rule 11–106(b)(1) does not apply at all to CINA cases. It argues:

[T]he language used in Rule 11–106(b) and the pertinent CINA and delinquency statutes compel the conclusion that the waiver provision in 11–106 was intended to apply solely to delinquency and CINS matters. Hence the court did not err in allowing Ms. Q. to represent herself, after she had previously been advised of her right to counsel, because a party in any civil matter is entitled to proceed *pro se.*

Both appellees [14] underscore that the primary purpose of CINA proceedings is to protect the child's best interests; the proceedings are civil in nature; the dispositions available in a CINA case "involve child custody, and do not involve any form of commitment for parents"; and CINA matters do not subject parents to criminal penalties. To that end, they observe that "the State must meet the heightened beyond a reasonable doubt standard in a delinquency case," because a liberty interest is implicated, whereas "the less stringent preponderance of the evidence standard applies in CINA adjudications," because no liberty interest is implicated. Given these key differences, argue appellees, "Maryland courts have consis-

---

14. Alijah and DSS filed separate briefs but make several similar arguments as to the waiver of counsel issue. Therefore, unless otherwise noted, we shall refer to appellees' arguments collectively.

tently refused to apply the same procedural protections available in delinquency proceedings, to parents involved in CINA proceedings."

In addition, DSS argues that the "commonsense interpretation of Md. Rule 11–106(b)(1) is that it applies [only] to juvenile petitions filed *against* children, rather than CINA petitions, which are filed for the protection of children." According to DSS, the separate sections of Rule 11–106(b) signify a "legislative intent to handle CINA cases and delinquency cases differently." The Department explains:

Rule 11–106(b) is divided into four distinct and separately numbered sections. The first section describes a waiver procedure to be used if "a respondent or his parent indicates a desire or inclination to waive representation for himself." Rule 11–106(b)(1). Section two states that indigents in *delinquency, child in need of supervision, and contributing cases* are entitled to legal representation at no cost unless that right is "knowingly and intelligently waived." Rule 11–106(b)(2). Section three states that CJP § 3–821 governs the right to counsel in a CINA case.[15] Rule 11–106(b)(3). Section four addresses the appointment of an attorney to represent a child who is not indigent. Rule 11–106(b)(4).

Moreover, DSS contends that the "party" referred to in Rule 11–106(b)(1) is a "respondent or his parent," which "indicate[s] that the waiver procedure is intended to apply only in the context of delinquency and CINS cases." It posits: "The absence of additional language in Rule 11–106(b)(3) or in the Courts Article requiring that a party in a CINA case knowingly and intelligently waive the right to counsel indicates that the waiver procedure does not apply to CINA matters."

DSS contends that appellant had "ample opportunity to ask [Ms. Gilhooly] to continue with the representation or to inform

---

**15.** Former C.J. § 3–821 concerned a party's right to counsel in a CINA case. It is now found in C.J. § 3–813, although Rule 11–106 does not reflect this statutory change.

the court that she did not wish to dismiss her lawyer." It also argues:

> The applicable statute pertaining to a parent's right to counsel in a CINA case, CJP § 3–813, mandates the right to counsel at every stage of the proceedings, but does not require that a parent be continuously re-apprised of the right to counsel at every subsequent hearing. CJP § 3–813. Had the legislature intended that parents have such a right to advisement in CINA cases, it could have enacted a statute similar in form to CJP § 3–8A–20, which specifically applies to juvenile causes *other than* CINA cases.[ ] *See* Subtitle 8A of CJP. CJP § 3–8A–20 sets forth a waiver procedure that applies when a *child* in a delinquency case or child in need of supervision (CINS) case chooses to waive the right to counsel.[ ] CJP § 3–8A–20(b). The legislature has not enacted any analogous provision to CJP § 3–8A–20 in the CINA statute. *See* Subtitle 8 of CJP.

In sum, because Ms. Q.'s "personal liberty interests" were not at stake, appellees contend that "the necessity of a personal waiver of the right to counsel" was neither triggered nor required.

We begin with a review of the relevant portion of C.J. § 3–813:

### § 3–813. Right to counsel.

(a) *In general.*—Except as provided in subsections (b) and (c) of this section, a party is entitled to the assistance of counsel at every stage of any proceeding under this subtitle [Juvenile Causes—Children in Need of Assistance].

(b) *Eligible parties.*—Except for the local department and the child who is the subject of the petition, a party is not entitled to the assistance of counsel at State expense unless the party is:

(1) Indigent; or

(2) Otherwise not represented and:

(i) Under the age of 18 years; or

(ii) Incompetent by reason of mental disability.

(c) *Representation by Office of the Public Defender.*—The Office of the Public Defender may not represent a party in a CINA proceeding unless the party:

(1) Is the parent or guardian of the alleged CINA;

(2) Applies to the Office of the Public Defender requesting legal representation by the Public Defender in the proceeding; and

(3) Is financially eligible for the services of the Public Defender.

Ms. Q.'s status as an indigent, and her statutory entitlement to legal representation, are not challenged on appeal. We focus here only on the waiver of her entitlement to counsel. Maryland Rule 11–106, in the "Juvenile Causes" Title, is pertinent to the issue of waiver. It states, in part:

**Rule 11–106.  Right to counsel.**

a.  **In all proceedings—Appearance of out-of-state attorney.**  The respondent is entitled to be represented in all proceedings under this Title by counsel retained by him, his parent, or appointed pursuant to the provisions of subsection b 2 and 3 of this Rule.  An out-of-state attorney may enter his appearance and participate. . . .

b.  **Waiver of representation—Indigent cases—Non-indigent cases.** 1. *Waiver procedure.  If, after the filing of a juvenile petition, a respondent or his parent indicates a desire or inclination to waive representation for himself, before permitting the waiver the court shall determine, after appropriate questioning in open court and on the record, that the party fully comprehends:*

*(i)  the nature of the allegations and the proceedings, and the range of allowable dispositions;*

*(ii)  that counsel may be of assistance in determining and presenting any defenses to the allegations of the juvenile petition, or other mitigating circumstances;*

*(iii)  that the right to counsel in a delinquency case, a child in need of supervision case, or a case in which an adult is charged with a violation of Section 3–831 of the Courts Article includes the right to the prompt assignment*

of an attorney, without charge to the party if he is financially unable to obtain private counsel;

(iv) that even if the party intends not to contest the charge or proceeding, counsel may be of substantial assistance in developing and presenting material which could affect the disposition; and

(v) that among the party's rights at any hearing are the right to call witnesses in his behalf, the right to confront and cross-examine witnesses, the right to obtain witnesses by compulsory process, and the right to require proof of any charges.

2. *Representation of indigents in delinquency, child in need of supervision, and contributing cases. (a) Unless knowingly and intelligently waived, and unless counsel is otherwise provided,* an indigent party, or an indigent child whose parents are either indigent or unwilling to employ counsel, shall be entitled to be represented by the Office of the Public Defender in a delinquency case, a child in need of supervision case, or a case in which an adult is charged with a violation of Section 3–831 of the Courts Article, at any stage in a waiver, adjudicatory or disposition hearing, or hearing under Rule 11–116 (Modification or Vacation of Order).

(b) Upon request or upon the court's own motion, the Office of the Public Defender shall appoint, in a delinquency case, a child in need of supervision case, or a case in which an adult is charged with a violation of Section 3–831 of the Courts Article, separate counsel to represent any indigent party other than the child if the interests of the child and those of the party appear to conflict, and if such counsel is necessary to meet the requirements of a fair hearing.

3. *Child in need of assistance cases. A party in a child in need of assistance proceeding is entitled to the assistance of counsel as provided in Section 3–821 of the Courts Article.*[16]

---

**16.** As previously noted, former C.J. § 3–821 of the CINA statute is now found in C.J. § 3–813.

4. Non-indigent cases. Upon motion of any party or upon the court's motion, the court may appoint an attorney to represent a child. Compensation for the services of the attorney may be assessed against any party.

(Emphasis added.)

The principles of statutory construction pertain to our interpretation of C.J. § 3–813. Similarly, in our interpretation of Rule 11–106, "we must apply the same standards of construction that apply to the interpretation of a statute." *State v. Wiegmann,* 350 Md. 585, 592, 714 A.2d 841 (1998). *See also Johnson v. State,* 360 Md. 250, 264, 757 A.2d 796 (2000) (recognizing that " '[t]he canons and principles which we follow in construing statutes apply equally to an interpretation of our rules.' ") (Citation omitted). Therefore, we turn to review these principles.

"The cardinal rule of statutory interpretation is to ascertain and effectuate the real and actual intent of the Legislature." *Lockshin v. Semsker,* 412 Md. 257, 274, 987 A.2d 18 (2010). Our analysis is guided by the plain language of the statute. *Id.* "Similarly, with respect to the Maryland Rules, we seek to ascertain the Court of Appeals's intent in promulgating the rule," *In re Charles K.,* 135 Md.App. 84, 97, 761 A.2d 978 (2000), giving the words their ordinary meaning. *Zetty v. Piatt,* 365 Md. 141, 152, 776 A.2d 631 (2001). In addition, "we construe the words in the text of a rule" so as to give "effect to the rule as a whole." *In re Charles K.,* 135 Md.App. at 97, 761 A.2d 978. As with statutes, when we construe a rule, "we must give effect to the entire rule, 'neither adding, nor deleting, words in order to give it a meaning not otherwise evident by the words actually used.' Our mission is to give the rule a reasonable interpretation in tune with logic and common sense." *In re Victor B.,* 336 Md. 85, 94, 646 A.2d 1012 (1994) (citation omitted); *see Brown & Williamson Tobacco Corp. v. Gress,* 378 Md. 667, 676, 838 A.2d 362 (2003).

Ordinarily, if the language of a statute is unambiguous, our inquiry as to legislative intent comes to an end.

*Lockshin,* 412 Md. at 275, 987 A.2d 18. If a statute is ambiguous, however, we look to the "legislative intent in other indicia, including the history of the legislation or other relevant sources intrinsic and extrinsic to the legislative process." *Id.* at 276, 987 A.2d 18. Similarly, if a rule is unambiguous, our analysis usually terminates. *Hoang v. Hewitt Ave. Assocs.,* 177 Md.App. 562, 588, 936 A.2d 915 (2007). But, when the rule is ambiguous, "we may look to other sources in order to determine the Court of Appeals's intent." *Wiegmann,* 350 Md. at 592, 714 A.2d 841. Nevertheless,

> [e]ven if the language of a rule is clear, we may consider extrinsic material that " 'fairly bears on the fundamental issue' " of the purpose or goal of the rule.... This is because "[o]ur mission is to give the rule a reasonable interpretation in tune with logic and common sense." Therefore, we may consider the history of a particular rule as an aid to determining the court's intent.

*Id.* at 592–93, 714 A.2d 841 (alteration in original) (citations omitted).

In *Johnson,* 360 Md. at 265, 757 A.2d 796 (citations omitted), the Court explained:

> The venerable plain meaning principle, central to our analysis, does not, however, mandate exclusion of other persuasive sources that lie outside the text of the rule. We have often noted that looking to relevant case law and appropriate secondary authority enables us to place the rule in question in the proper context.

As we have seen, Rule 11–106(b) is captioned, in part, "Waiver of representation," and Rule 11–106(b)(1) sets forth the "Waiver procedure." In our view, Rule 11–106(b) distinguishes CINA cases and delinquency cases with respect to waiver of counsel.

Rule 11–106(b)(1) refers to the "filing of a juvenile petition." In addition, the "party" referred to in Rule 11–106(b)(1) is a "respondent or his parent." As DSS suggests, the common-sense interpretation of Rule 11–106(b)(1) is that it applies to petitions filed *against* children, not petitions filed *for* their

protection, such as a CINA petition. Moreover, Rule 11–106(b)(2) specifically refers to the knowing and intelligent waiver of counsel, but only as to "delinquency, child in need of supervision, and contributing cases." Notably, that subpart omits any reference to CINA cases. It is only in Rule 11–106(b)(3) that we see an explicit reference to CINA cases within the province of C.J. § 3–813. Yet, no other category of cases is mentioned in that subpart, nor is there any reference to the waiver of counsel. Thus, construing Rule 11–106 as a whole, and looking at its plain text, the rule does not establish the requirement of a voluntary and knowing waiver of counsel in CINA cases.

The Court of Appeals Standing Committee on Rules of Practice and Procedure (the "Rules Committee") assists the Court of Appeals in developing the rules. *See* Md. Rule 16–801. As we have seen, we may look to other sources to confirm or aid in our interpretation. The discussion of the Rules Committee as to the matter of the waiver of counsel in delinquency cases is consistent with our view.

The waiver of counsel provisions in Rule 11–106(b)(1) derive from Rule 906, adopted in 1976. The minutes of the November 1975 meeting of the Chapter 900 (Juvenile Causes) Rules Subcommittee of the Rules Committee contain the following pertinent remarks:

> Judge Karwacki stated that in this, and other, rules such as Rule 906 (Right to Counsel) *delinquency cases ought to be treated differently than non-delinquency cases,* and that all such rules should be split into two sections.
>
> *    \*    \*    \**
>
> *Rule 906 b 1 presumably applies only to delinquency cases.*

Minutes from the Chapter 900 (Juvenile Causes) Rules Subcomm. 3, 5 (Nov. 19, 1975) (emphasis added). From these minutes, it would indeed appear that the waiver provision of Rule 11–106(b)(1) was intended to apply only to juvenile delinquency proceedings.

The case of *In re Christopher T.*, 129 Md.App. 28, 740 A.2d 69 (1999), a delinquency case, is noteworthy. There, a juvenile appeared without an attorney for an adjudicatory hearing. *Id.* at 32, 740 A.2d 69. Based on the court's belief that it had previously advised the juvenile of his right to a lawyer, and that his mother "lacked 'any good reason' " for failing to obtain counsel, the trial court found a waiver of counsel by inaction, proceeded with the hearing, and determined that the juvenile was a delinquent. *Id.* On appeal, we concluded that "strict compliance with Rule 11–106(b) is essential to uphold a waiver of counsel in a *delinquency* proceeding." *Id.* at 42, 740 A.2d 69 (emphasis added).

In its decision to vacate and remand, the Court said, *id.* at 40, 740 A.2d 69:

[E]ven if a waiver could be based on a finding that Ms. T. was dilatory, Rule 11–106(b) does not specifically provide for waiver by inaction....

Even if appellant had expressly waived his right to counsel, or did so by inaction, such a waiver would have been ineffective, because the record plainly demonstrates that the court failed to provide the information mandated by Md. Rule 11–106(b)(i), (ii), (iv), and (v). Specifically, the record is devoid of any indication that appellant was advised of the following ... [information detailed in Md. Rule 11–106(b)(1)(i)–(v).]

In *In re Shawn P.*, 172 Md.App. 569, 916 A.2d 399 (2007), also a juvenile delinquency case, we again examined a juvenile's alleged waiver of the right to counsel by inaction. The Court stated, *id.* at 583, 916 A.2d 399:

The statute provides that there be appropriate questioning in open court, on the record. That questioning must elicit that the child fully comprehends [the information detailed in Md. Rule 11–106(b)(1)(i)–(v) ].... [T]he record clearly reflects that no conference took place where any of the above matters could have been discussed, nor were they explained on the record.

To be sure, in the two cases discussed above, the Court only considered the waiver issue in the delinquency context, and not in regard to CINA proceedings. Here, the issue concerns the procedure, if any, attendant to the waiver of counsel in a CINA case. Therefore, the cases above are not controlling.

*In re Blessen,* 392 Md. 684, 898 A.2d 980 (2006) (*"Blessen"*), is also illuminating, although it concerned the waiver of the right to a contested adjudicatory hearing in a CINA case, rather than the waiver of the right to counsel. In that case, the trial court did not hold a contested CINA adjudicatory hearing because counsel for the mother, Ms. H., represented that the mother wanted to mediate the dispute. *Id.* at 688, 898 A.2d 980. After mediation, the parties agreed to an amended petition, the facts of which formed the basis for a finding of CINA. *Id.* at 688–89, 898 A.2d 980. At the conclusion of the proceedings, however, Ms. H. protested that the court had never inquired as to her character or her "situation." *Id.* at 689, 898 A.2d 980. The court indicated that it had relied on her attorney as to the stipulation of facts contained in the amended CINA petition. *Id.* at 690, 898 A.2d 980. The court placed the child in foster care. *Id.* at 689, 898 A.2d 980.

On appeal, the mother contended that the stipulation of counsel was not sufficient to waive her right to a contested CINA adjudicatory hearing. *Id.* at 708, 898 A.2d 980. Rather, she argued that "due process require[d] application of the more stringent standard of waiver in CINA adjudicatory proceedings." *Id.* at 702, 898 A.2d 980. Ms. H. asserted, *id.* at 692, 898 A.2d 980:

[T]he right to a contested CINA adjudicatory hearing only can be waived where the record affirmatively discloses a personal, voluntary, knowing and intelligent relinquishment of the right by the parent herself, which requires a colloquy on the record in which the court would advise the parent of the right to have a contested CINA adjudicatory hearing, of the right to compel and present witnesses and to present evidence during the proceedings, that waiver of the hearing could lead to limitation of the parental rights, of the risk of

making incriminating statements during the proceedings, and of the burden of proof assigned to the State, as well as would inquire into whether the parent is under the influence of alcohol or drugs, understands the English language, and is waiving the proceedings voluntarily, absent any duress or coercion.

The Court disagreed, stating, *id.* at 708, 898 A.2d 980:

Certainly if the due process rights of parents are not violated by the failure to file a timely notice of objection in termination of parental rights proceedings, their due process rights are not violated when they do not personally waive less intrusive CINA adjudicatory proceedings.

Contrary, then, to the arguments raised by Ms. H., the stricter standard of waiver requiring the court to conduct a personal colloquy with a parent to establish her or his voluntary, knowing and intelligent waiver ordinarily only has been applied where the rights to be waived have been deemed to be "fundamental," and the proceedings have been those that could result in confinement. In the present case, Ms. H.'s waiver of a contested CINA adjudicatory hearing was sufficient when her attorney concurred with the stipulated facts.[17]

Based on all of the foregoing, we are satisfied that the strict waiver of counsel requirements embodied in Rule 11–106(b) do not apply to a parent's waiver of his or her statutory right to counsel in a CINA case. However, this conclusion does not fully dispose of appellant's claim of error. We elaborate.

■ In *Lassiter v. Department of Social Services,* 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981), the Supreme Court left to the trial court—subject to appellate review—the decision of whether due process requires the appointment of counsel in a termination of parental rights proceeding. *Id.* at 13, 101 S.Ct. 2153. But, the Court characterized as "enlight-

---

17. In his dissent, Chief Judge Bell said that "the trial court had a duty to question [Ms. H.] further as to the meaning of her statements and her intention." *Id.* at 723, 898 A.2d 980.

ened and wise" those state practices providing for appointment of counsel in both neglect and termination cases, stating, *id.* at 33–34, 101 S.Ct. 2153:

> A wise public policy, however, may require that higher standards be adopted than those minimally tolerable under the Constitution. Informed opinion has clearly come to hold that an indigent parent is entitled to the assistance of appointed counsel not only in parental termination proceedings, but in dependency and neglect proceedings as well.

In Maryland, the Legislature enacted C.J. § 3–813, which provides for the right to counsel in CINA proceedings. The General Assembly has underscored its view of the importance of the right to counsel in such cases by making clear that the right is available to indigent persons through the Office of the Public Defender. *See* Md.Code (2001, 2008 Repl.Vol.), § 16–204(b)(1)(v) of the Criminal Procedure Article ("C.P.") (stating that the Office of the Public Defender shall provide representation for "a proceeding involving children in need of assistance under § 3–813 of the Courts Article").[18]

We are mindful that a statutory right, such as the one created by C.J. § 3–813 and C.P. § 16–204,[19] "while deserving of protection, is not necessarily the equivalent of a constitutional right." *In the Matter of the Welfare of: G.L.H.*, 614 N.W.2d 718, 722 (Minn.), *cert. denied sub nom. Jackson v. Ramsey County*, 531 U.S. 967, 121 S.Ct. 403, 148 L.Ed.2d 311 (2000). Nevertheless, in order to effectuate and safeguard the statutory right to counsel in CINA cases, certain minimal protections must govern the waiver of counsel, even if the waiver need not satisfy Rule 11–106(b)(1) or constitutional standards of a voluntary, knowing, and intelligent waiver. *See Bearden v. Ark. Dep't of Human Servs.*, 344 Ark. 317, 42 S.W.3d 397, 402 (2001) (noting the distinction between a

---

**18.** Under C.P. § 16–204, there are only six categories of cases for which legal representation is provided to indigent persons at State expense.

**19.** These provisions would seem to satisfy the Supreme Court's characterization of "enlightened and wise" enactments.

statutory right and a due process right to counsel, the latter of which requires a "voluntary, knowing, and intelligent waiver" (citation omitted)); *cf. In re Adoption/Guardianship of Chaden M.*, 189 Md.App. 411, 417, 984 A.2d 420 (2009) (holding that the statutory right to assistance of counsel in a termination of parental rights case includes the right to effective assistance of counsel), *cert. granted*, 415 Md. 40, 997 A.2d 791 (2010).

To be sure, *Blessen, supra*, 392 Md. 684, 898 A.2d 980, made clear that a full blown waiver of counsel colloquy is not required with respect to a contested CINA adjudicatory *hearing. Id.* at 708, 898 A.2d 980. But, the case did not concern a waiver of the statutory right to counsel. Moreover, the Court certainly suggested that at least some waiver of the right to a contested CINA hearing was appropriate, even if it did not have to satisfy the strict "voluntary, knowing, intelligent" standard. *Id.* Under the facts of that case, the Court indicated that it was sufficient that such a waiver could be made by counsel for the party. *Id.* Under the facts of this case, however, Ms. Gilhooly could not waive Ms. Q.'s right to counsel.

The relationship of lawyer to client is generally one of agency. *See Salisbury Beauty Sch. v. State Bd. of Cosmetologists*, 268 Md. 32, 45, 300 A.2d 367 (1973). Ordinarily, "[t]he actions of an attorney within the scope of his employment are binding upon his client under the ordinary principles of agency." *Id.* at 46, 300 A.2d 367; *see* Rule 1–332 (recognizing that an attorney may act for a client). In *Blessen*, it was reasonable for the trial court to rely on the waiver representations made by Ms. H.'s lawyer, who unequivocally served as the agent for Ms. H.'s interests throughout the proceedings. *See Ins. Co. of N. Am. v. Miller*, 362 Md. 361, 374–75, 765 A.2d 587 (2001) ("[T]here is a *prima facie* presumption that an attorney has authority to bind his client by his actions relating to the conduct of litigation." (alteration in original) (citation omitted)); *see also* 7 Am.Jur.2d *Attorneys at Law* § 157 (2007) ("The entry of appearance by an attorney is itself presumptive evidence of his or her authority to represent the person for

whom he or she appears.... In a civil proceeding, a client is bound by statements of his or her attorney made in open court when the statements are made in the client's presence and are not denied by the client.").

The general agency principle is not without exception, however. For example, in the context of settlement agreements, we have declined to apply the presumption that counsel's acts are imputed to the client. We said in *Kinkaid v. Cessna*, 49 Md.App. 18, 22, 430 A.2d 88 (1981), that "an attorney has no implied authority to compromise his client's claim." *See also King v. Bankerd*, 303 Md. 98, 108, 492 A.2d 608 (1985) (" 'Even if a general discretion is vested in the agent, it is not deemed to be unlimited. But it must be exercised in a reasonable manner, and cannot be resorted to in order to justify acts, which the principal could not be presumed to intend, or which would defeat, and not promote, the apparent end or purpose, for which the power was given.' " (citation omitted)); *Mitchell Properties, Inc. v. Real Estate Title Co.*, 62 Md.App. 473, 483, 490 A.2d 271 (1985).

At the hearing on October 23, 2009, Ms. Gilhooly informed the court that she came prepared to enter her appearance, but that Ms. Q. did not want her services. In fact, as of October 9, 2009, Ms. Gilhooly was already the attorney of record. In any event, when Ms. Gilhooly sought to withdraw, the court immediately acquiesced. It said: "All right. We'll excuse you, unless somebody objects." At the time, Ms. Gilhooly was not necessarily acting as her client's agent or in her client's interest; in the context of an eleventh hour request by an attorney to withdraw from a case, the attorney's interest may be at odds with that of the client. Under such circumstances, Ms. Gilhooly's representation to the court should not have bound Ms. Q. to a waiver. *See Colonial Bldg. & Loan Ass'n v. Boden*, 169 Md. 493, 498, 182 A. 665 (1936) ("[T]he act of the agent will not bind the principal if the interests of the former in a given transaction are hostile to those of the latter."). Instead, the court should have inquired of Ms. Q. to verify whether she wanted Ms. Gilhooly's legal services, to confirm that she was electing self-representation over professional

representation at an evidentiary hearing that was about to begin.

We recognize that Ms. Q. did not object when the court said, "unless somebody objects." But, neither did she expressly consent. Indeed, Ms. Q. never uttered a single word, nor does the record reflect so much as a nod by her in agreement with Ms. Gilhooly. As to Ms. Q.'s failure to object, it is for this very reason that litigants are guided and assisted by counsel. Because the court's inquiry was not specifically directed to Ms. Q., she could have thought that the court's comment was directed to counsel for DSS and Alijah. Alternatively, Ms. Q. may have been too intimidated to speak up. That we are left to speculate about Ms. Q.'s silence underscores the issue.

As we see it, in the absence of any affirmative indication by Ms. Q. that she assented to the discharge of her counsel, it was incumbent on the judge to make some attempt to verify that, moments before the hearing was to begin, Ms. Q. wanted to discharge her lawyer. *Cf. Dillard v. State*, 415 Md. 445, 453, 457–58, 464–66, 3 A.3d 403 (2010) (finding that the trial court had abused its discretion in not "fully inquir[ing] about ... the extent of the prejudice to the defendant," even though the defendant had not asked for a voir dire of the jurors involved in potential misconduct, and stating that "the court has a duty to fully investigate allegations of juror misconduct before ruling on a motion for a mistrial, and that failure to conduct a *voir dire* examination of the jurors before resolving the issue of prejudice is an abuse of the trial judge's discretion"); *State v. Brown*, 342 Md. 404, 429–30, 676 A.2d 513 (1996) (where defendant's counsel and defendant's father addressed the trial court as to the defendant's request for discharge of counsel, the Court said: "It is *Respondent's* reply, not that of his father [or his counsel], that ordinarily would be relevant to determine whether or not the discharge [of counsel] should be permitted, because the [Sixth Amendment] right to counsel and the right to self-representation are personal rights," and "the responsibility is on the trial judge to ensure that the reason for requesting dismissal of counsel is explained" (emphasis added)).

We are mindful of *Blessen's* admonition that a personal, voluntary, knowing, and intelligent waiver colloquy is ordinarily required only in proceedings that involve fundamental rights or could result in confinement. Although the Sixth Amendment does not apply here, *Chaden M.,* 189 Md.App. at 425, 984 A.2d 420, a CINA proceeding implicates a "fundamental" right; a CINA case may alter the parent-child relationship and it may lead to the termination of parental rights. In *In re Maria P.,* 393 Md. 661, 904 A.2d 432 (2006), the Court of Appeals stated:

> It is well-established that a parent's interest in raising a child is a fundamental right. Equally understood is the principle that a parent's fundamental right is not absolute, and is subject to the best interests of the child standard. [A parent] ... clearly has a liberty interest in the care and custody of her child, and *when, as in a CINA proceeding, a state seeks to change the parent-child relationship, "the due process clause is implicated."*

*Id.* at 675–76, 904 A.2d 432 (2006) (citations omitted) (emphasis added).

*In re Maria P.* supports our view that the court should have attempted to verify with Ms. Q. that she wanted to discharge her lawyer. In that case, the mother was excluded from the courtroom during her child's testimony at a CINA hearing. *Id.* at 676, 904 A.2d 432. In finding that the trial court abused its discretion, the Court stated: "There is *no indication on the record* that the hearing judge considered Petitioner's due process rights. *No testimony was placed* on the record, and *no inquiries were made* of the Department as to the specific reasons for Petitioner's exclusion during [her child's] testimony." *Id.* (emphasis added).

Maryland Rule 2–132(b) is also relevant. It provides that a court may deny a motion to strike an attorney's appearance if it finds that "withdrawal of the appearance would cause undue delay, prejudice, or injustice." To be sure, there is no script to which a trial court must adhere in connection with a waiver of counsel in a CINA case. But, we cannot determine from the record whether the court considered the issue of prejudice.

In addition, as we have noted, the court's Order said: "The Court verified with the mother that she no longer wanted the services of the Office of the Public Defender, and that she wanted to proceed without the assistance of counsel." Even if the court is not required to verify the CINA parent's desire to discharge counsel, the court's finding is not supported by the record. This suggests that the court may have discharged counsel in the mistaken belief that it had verified Ms. Q.'s desire to do so.

Finally, we are unpersuaded by the argument that Ms. Q. was not prejudiced by what occurred. In *In re Maria P.*, the Court found that the court's error was not harmless, noting that the appellant in that case was unable to confer with her attorney as a result. *Id.* at 678, 904 A.2d 432. Ms. Q.'s unskillful cross-examination was plainly evident. To find harmless error would undermine the statutory entitlement to counsel set forth in C.J. § 3–813.

**JUDGMENT VACATED. CASE REMANDED TO THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY FOR FURTHER PROCEEDINGS. COSTS TO BE PAID BY APPELLEES.**